**Sean H. CHISZAR, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 91A04–1004–CR–290.**

Court of Appeals of Indiana.

Oct. 29, 2010.

818

Kelly Leeman, Logansport, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Arturo Rodriguez II, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Sean Chiszar appeals his convictions for two counts of Voyeurism, as Class D felonies; three counts of Possession of Child Pornography, Class D felonies; Possession of Paraphernalia, as a Class A misdemeanor; Possession of Marijuana, as a Class A misdemeanor; and Battery, as a Class A misdemeanor, following a bench trial. He presents five issues for our review, which we consolidate and restate as four issues:

1. Whether the voyeurism statute is void for vagueness.

2. Whether the trial court abused its discretion when it admitted evidence obtained during a warrantless search.

3. Whether a subsequent search warrant was supported by sufficient probable cause.

4. Whether the State presented sufficient evidence to support two of his convictions.

We affirm.

### FACTS AND PROCEDURAL HISTORY

On April 24, 2009, Chiszar's fiancee, L.G., was spending the night at Chiszar's house in White County. L.G. had fallen asleep with her clothes on in Chiszar's bedroom. At approximately 2:00 a.m. on April 25, L.G. awoke to find that Chiszar had removed her clothes and was attempting to have sexual intercourse with her. L.G. immediately heard "beeping sounds" coming from a video camera sitting next to the television, and she realized that Chiszar was recording her. Transcript at 226. L.G. asked him, "Why are you videotaping me?" *Id.* at 227. Chiszar responded that he was not videotaping her. L.G. then stated, "There is a camera. I'm looking at the camera. It is right there." *Id.* at 228. Chiszar again denied that he was videotaping her.

L.G. got up and tried to grab the video camera, but Chiszar got it first and ran out of the house and into the garage. L.G. chased him and confronted him in the garage. L.G. tried repeatedly to get the video camera from Chiszar, but he would not give it to her, and he ultimately threw it underneath a chair in the garage. When L.G. tried to retrieve it, Chiszar grabbed L.G. by her hair and "threw [her] into the car." *Id.* Chiszar retrieved the camera and ran inside to the kitchen, and L.G. followed.

Chiszar's minor son, who had been sleeping in his bedroom, was awake and standing in the kitchen. Chiszar put the video camera inside a cupboard, and L.G. continued to struggle with Chiszar in an effort to get the camera. At one point, Chiszar threw L.G. against a kitchen island. Chiszar then went back to the garage, with the video camera, and locked himself inside the garage. L.G. instructed Chiszar's son to call the police, which he did.

White County Sheriff's Deputy Aaron Page arrived a short time later and found Chiszar and L.G. in the front yard. L.G. was "crying" and "pacing and screaming." *Id.* at 115. Deputy Page approached L.G. first and asked her to calm down, and he directed her to go "up by the house," but L.G. went inside the house. *Id.* at 118. Deputy Page began talking to Chiszar, who explained that L.G. "was just crazy, and she thought she had seen something that really wasn't there." *Id.* Deputy

Page asked Chiszar to explain what he meant, to which he responded that

> his ex-wife had left him because he had been taping her in a sexual nature without her permission, and he had told [L.G. about] that prior to them getting engaged, and she thought that she had [seen] a video camera [that night], and that he was possibly taping her, and she freaked out and went crazy and started hitting him and whatnot.

*Id.* at 119. Deputy Page explained to Chiszar that he was going to go inside to talk to L.G., and Chiszar asked whether he could also go inside the house to be with his children, and Deputy Page assented.

Once inside the house, Deputy Page found L.G. in Chiszar's bedroom packing her belongings. L.G. was still very upset, but she was able to tell Deputy Page about the video camera and the ensuing struggle with Chiszar. A short time later, two other sheriff's deputies arrived and entered the house.

White County Sheriff's Deputy Jared Baer and Reserve Deputy Matt Banes arrived, knocked on the door, and entered Chiszar's house. They found Chiszar sitting with his daughter in the living room just inside the front door. Deputy Baer asked Chiszar where the other deputy was, and he directed Deputy Baer to his bedroom. After Deputy Baer spoke briefly with Deputy Page, Deputy Baer returned to speak to Chiszar to get his version of events.

Deputy Baer and Chiszar went outside to talk. Chiszar denied having videotaped L.G. Deputy Baer advised Chiszar that he was not under arrest, and he asked Chiszar for consent to search the garage for the alleged video camera and/or tape. Chiszar gave his consent to search the garage.

The three deputies began searching the garage. Deputy Banes found a brown paper bag inside a file cabinet, and the bag contained a baggie with a "green, brown, leafy substance[;]" a lighter; a "red metal smoking device[;]" some rolling papers; and a cigarette roller. *Id.* at 173–74. Deputy Banes pulled the baggie out and asked Chiszar what it was. Chiszar responded that it was marijuana and that it belonged to him. The deputies then resumed searching for the video camera. Deputy Baer found a locked toolbox and asked Chiszar to unlock it, but Chiszar said that he did not have the key. At some point, L.G. stated to Chiszar, "Just give me the tape, Sean, just give me the tape. Give me the tape, and this will all go away." Deposition of Jared Baer at 15. To which Chiszar responded, to the deputies, "You hear her, if I give her the tape, nothing will happen[.]" *Id.* at 16. Deputy Baer told Chiszar that they "do not make deals and that if he had the tape [they] needed the tape." *Id.*

At that point, Chiszar walked over to the refrigerator, reached up above it, and pulled a tape out from behind a piece of wood. Chiszar gave the tape to L.G. and said, "Here's the tape." *Id.* Deputy Baer asked Chiszar, "How do we know . . . this is the tape of her? Where's the video camera?" *Id.* Chiszar replied, "She asked for the tape, I gave her the tape." *Id.* Deputy Baer asked, "How are we supposed to know that this is the tape that was taped tonight? When was this taped?" *Id.* Chiszar did not answer. Deputy Baer asked Chiszar where the video camera.was, and he eventually stated that he would "take [them] to it." *Id.*

Chiszar went outside, and Deputy Page and Deputy Baer followed. Chiszar took them to a sink hole near the edge of his property, retrieved a video camera out of the hole, and gave the video camera to

Deputy Baer. Deputy Baer confirmed that there was a videotape inside the camera and asked Chiszar whether he had used that camera and tape to videotape L.G. earlier that night, and Chiszar responded in the affirmative. Deputy Baer then took a recorded statement of L.G., who reported that Chiszar had battered her while she was struggling to get the video camera from him. Deputy Page then arrested Chiszar for battery.

Later that day, Tony Lantz with the White County Prosecutor's Office executed an affidavit seeking a search warrant to recover videotapes, video equipment, computers, modems, a laptop computer, and related equipment from Chiszar's residence. In his affidavit, Lantz stated

> Earlier today police went to the Chiszar residence because his girlfriend, [L.G.] discovered him taping her, without her consent, while he was attempting to have sex with her. The police recovered the camera and 2 tapes. [L.G.] said she has seen what she believes to be child pornography on his computer. I am aware from a previous complaint that Chiszar was accused of videotaping his previous wife without her consent. [L.G.] told me she has a tape of Chiszar's whereby his previous girlfriend was videotaped at his residence having sexual intercourse with him and the tape was done without the previous girlfriend's consent. Both Chiszar and [L.G.] have teenage/preteen daughters and [L.G.] is concerned that the teenage girls may have been videotaped. [L.G.] and Chiszar have had an ongoing sexual relationship for approx. 2 years and additional videos of her and others may be located in the residence. I believe [L.G.] is truthful in that the information

she provided is first-hand and she has no criminal history of crimes of dishonesty. During a prior investigation of voyeuristic activity I viewed videotapes taken by Chiszar peeping into windows of houses viewing women in various states of undress. Chiszar was taken into custody and remains in custody at this time.

Exhibit A. A magistrate issued the search warrant. When officers executed the warrant at Chiszar's house, they found another videotape and a computer, which contained images of child pornography on it. One videotape depicted L.G. naked, and another videotape depicted a second victim, L.B.[1]

Under three separate causes, the State charged Chiszar with two counts of voyeurism, as Class D felonies; three counts of possession of child pornography, Class D felonies; possession of paraphernalia, as a Class A misdemeanor; possession of marijuana, as a Class A misdemeanor; and battery, as a Class A misdemeanor. The parties stipulated to consolidate all of the charges for a single bench trial. Chiszar moved to suppress evidence and moved to dismiss, but the trial court denied those motions. The trial court found Chiszar guilty as charged and sentenced him accordingly. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Vagueness Doctrine

■ Chiszar first contends that the voyeurism statute, Indiana Code Section 35–45–4–5, is unconstitutionally vague. That statute provides:

(a) A person:

(1) who:

peeping into the undressing area of L.B. without her consent using a video camera.

---

1. The parties do not discuss the details of the contents of the videotape of L.B., but Chiszar was charged with knowingly or intentionally

(A) peeps; or

(B) goes upon the land of another with the intent to peep;

into an occupied dwelling of another person; or

(2) who peeps into an area where an occupant of the area reasonably can be expected to disrobe, including:

(A) restrooms;

(B) baths;

(C) showers; and

(D) dressing rooms;

without the consent of the other person, commits voyeurism, a Class B misdemeanor.

(b) However, the offense under subsection (a) is a Class D felony if:

(1) it is knowingly or intentionally committed by means of a camera, a video camera, or any other type of video recording device; or

(2) the person who commits the offense has a prior unrelated conviction:

(A) under this section; or

(B) in another jurisdiction, including a military court, for an offense that is substantially similar to an offense described in this section.

(c) "Peep" means any looking of a clandestine, surreptitious, prying, or secretive nature.

In *Brown v. State,* 868 N.E.2d 464 (Ind. 2007), our Supreme Court set out the law applicable to a defendant's challenge to a statute for vagueness:

A challenge to the validity of a statute must overcome a presumption that the statute is constitutional. *State v. Lombardo,* 738 N.E.2d 653, 655 (Ind.2000). The party challenging the statute has the burden of proving otherwise. *Brady v. State,* 575 N.E.2d 981, 984 (Ind.1991).

Due process principles advise that a penal statute is void for vagueness if it does not clearly define its prohibitions. *Klein v. State,* 698 N.E.2d 296, 299 (Ind. 1998) (citing *Grayned v. City of Rockford,* 408 U.S. 104 [92 S.Ct. 2294, 33 L.Ed.2d 222] (1972)). A criminal statute may be invalidated for vagueness for either of two independent reasons: (1) for failing to provide notice enabling ordinary people to understand the conduct that it prohibits, and (2) for the possibility that it authorizes or encourages arbitrary or discriminatory enforcement. *City of Chicago v. Morales,* 527 U.S. 41, 56 [119 S.Ct. 1849, 144 L.Ed.2d 67] (1999); *Healthscript, Inc. v. State,* 770 N.E.2d 810, 815–16 (Ind.2002). A related consideration is the requirement that a penal statute give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden so that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Healthscript, Inc.,* 770 N.E.2d at 816 (quoting *United States v. Harriss,* 347 U.S. 612, 617 [74 S.Ct. 808, 98 L.Ed. 989] (1954)).

In *State v. Downey,* 476 N.E.2d 121, 123 (Ind.1985), this Court emphasized that "there must be something in a criminal statute to indicate where the line is to be drawn between trivial and substantial things so that erratic arrests and convictions for trivial acts and omissions will not occur. It cannot be left to juries, judges, and prosecutors to draw such lines." Accordingly, the statutory language must "convey sufficiently definite warning as to the proscribed conduct when measured by common understanding." *Rhinehardt v. State,* 477 N.E.2d 89, 93 (Ind.1985).

But a statute "is not void for vagueness if individuals of ordinary intelligence could comprehend it to the extent that it would fairly inform them of the

generally proscribed conduct." *Klein,* 698 N.E.2d at 299; *accord Lombardo,* 738 N.E.2d at 656. And the statute does not have to list specifically all items of prohibited conduct; rather, it must inform the individual of the conduct generally proscribed. *Lombardo,* 738 N.E.2d at 656. The examination of a vagueness challenge is performed in light of the facts and circumstances of each individual case. *Id.*

Here, Chiszar argues:

Applying the facts of this case to routine daily conduct shows how vulnerable the Defendant and others are to being charged with a crime while engaging in ordinary and common-place activities in their home [s]. With nothing more in its express language the statute transforms spouses, parents, lovers and others into criminals when they peep around a corner and into a room if it is one that a person can be expected to disrobe. People do disrobe in their homes in living rooms, dens, or kitchens if the occasion calls for it. A Cialis moment for instance. Is that sufficiently expected? A vindictive spouse, lover, or child with an eager[-]to[-]help police officer could have a person arrested who was "caught looking in on" their [sic] wife or husband, their child, or their lover. If they [sic] used a video camera to film them playing, sleeping, reading or baking under the plain language of I.C. [Section] 35–45–4–5 it would be a felony.

\* \* \*

If L.G.'s consent was not explicitly given[,] her consent was waived, implicit or constructively given by her presence with Chiszar in his home in his bedroom and in his bed where he could consent to the filming and recording of their conduct. Under the State's interpretation of the statute a person could *never* film another person or persons in their home unless that person knew of the filming and explicitly consented. This means no filming of a surprise birthday party. No filming of sleeping babies. No filming of abusive nannies. No filming of grandpa snoring. No household security camera. The potential list of the conduct made criminal by the State's interpretation of the voyeurism statute gives law enforcement unbridled discretion to arbitrarily and discriminatorily enforce the statute.

Brief of Appellant at 18–20 (emphasis original).

First, we reject Chiszar's contention that any room could constitute "an area where an occupant of the area reasonably can be expected to disrobe" under the statute. It is not commonplace for people to disrobe in their living rooms or kitchens, so that would not be a reasonable expectation. Second, the crux of the statute is consent. Spouses and significant others expect that they will see one another disrobing at regular intervals, and, under most circumstances, participants in such relationships impliedly consent to being seen without clothes on. But that is not to say that "peeping" is categorically permissible in such relationship settings.

It is the nature of the looking that is at issue here. The "looking" that is proscribed under the statute is "any looking of a clandestine, surreptitious, prying, or secretive nature." I.C. § 35–45–4–5(b). There can be no reasonable purpose for that kind of looking since, by definition, it is without the other person's knowledge, and, therefore, it is without the other person's consent. To look at someone in a clandestine or secret manner is to hide that looking from the other person, and it is that act that is proscribed by the statute. We hold that individuals of ordinary intelligence would comprehend the statute adequately to inform them of the pro-

scribed conduct and that the statute is not unconstitutionally vague.

To the extent that Chiszar contends the statute prohibits innocent conduct, like videotaping a surprise birthday party, we cannot agree. First, a surprise birthday party is unlikely to take place in an area where somebody is reasonably likely to disrobe. Second, unless the person videotaping the surprise party is hiding the camera and surreptitiously filming the event, there is no peeping. But, again, the "area" element of the statute is unlikely to be implicated in a surprise birthday party scenario.

■ Here, the evidence shows that Chiszar knew that he did not have L.G.'s consent to videotape her naked or engaging in sexual intercourse with him. While L.G. was sleeping, Chiszar videotaped himself taking L.G.'s clothes off, and he initiated sexual intercourse with her. L.G. woke up at that point and realized that Chiszar was videotaping her. L.G. was upset, and when she tried to grab the video camera, Chiszar took it and tried to prevent L.G. from getting it. When L.G. demanded that Chiszar give her the video camera, he denied having videotaped her. That evidence supports a reasonable inference that Chiszar knew that he did not have L.G.'s consent at the time that he videotaped her, and. thus, that he knowingly videotaped her in a clandestine manner in an area where she was likely to disrobe. Chiszar has not shown that the voyeurism statute is vague as applied to the circumstances of the instant case. *See Glover v. State*, 760 N.E.2d 1120, 1123 (Ind.Ct.App.2002), *trans. denied.*

### Issue Two: Admission of Evidence

■ Chiszar next contends that the trial court abused its discretion when it admitted the following evidence: the video camera; a videotape depicting Chiszar and

L.G.; and the marijuana and paraphernalia found in Chiszar's garage. Although Chiszar filed motions to suppress the challenged evidence, he proceeded to trial after denial of those motions; thus, the sole claim now is whether the trial court abused its discretion in admitting the evidence. *See Baxter v. State*, 891 N.E.2d 110, 117 (Ind.Ct.App.2008). An abuse of discretion occurs if a decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* In reviewing the trial court's ultimate ruling on admissibility, we may consider the foundational evidence from the trial as well as evidence from the motion to suppress hearing that is not in direct conflict with the trial testimony. *Id.*

Chiszar alleges violations of his rights under both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution. In essence, Chiszar maintains that the evidence was illegally obtained after the deputies' warrantless entry into his house and his subsequent consent to search the garage. In *Hayes v. State*, 794 N.E.2d 492, 495–96 (Ind.Ct.App.2003), *trans. denied,* this court explained the constitutionality of a "knock and talk" investigation, which is, in essence, what occurred here:

> The Fourth Amendment provides:
>
> > The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
>
> "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *State v.*

*Straub,* 749 N.E.2d 593, 597 (Ind.Ct. App.2001) (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752, (1972)). A principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter a residence for purposes of search or arrest. *Id.* Thus, searches and seizures inside a home without a warrant are presumptively unreasonable. *Id.* But there are a " 'few ... and carefully delineated' " exceptions to the warrant requirement. *Id.* (quoting *United States District Court,* 407 U.S. at 318 [92 S.Ct. 2125] ).

A knock and talk investigation "involves officers knocking on the door of a house, identifying themselves as officers, asking to talk to the occupant about a criminal complaint, and eventually requesting permission to search the house." *State v. Reinier,* 628 N.W.2d 460, 466 (Iowa 2001). "If successful, it allows police officers who lack probable cause to gain access to a house and conduct a search." *Id.* Both federal and state appellate courts which have considered the question, including the United States Court of Appeals for the Seventh Circuit, have concluded that the knock and talk procedure does not per se violate the Fourth Amendment.

"Though the 'knock and talk' procedure is not automatically violative of the Fourth Amendment, it can become so." *Keenom v. State,* 349 Ark. 381, 80 S.W.3d 743, 747 (2002). The constitutional analysis begins with the knock on the door. *Scott v. State,* 366 Md. 121, 782 A.2d 862, 867 (2001). The prevailing rule is that, absent a clear expression by the owner to the contrary, police officers, in the course of their official business, are permitted to approach one's dwelling and seek permission to question an occupant. *Id.* at 867–68.

"Not every confrontation between 'policemen and citizens' amounts to a Fourth Amendment 'seizure' of persons." *State v. Carlson,* 762 N.E.2d 121, 125 (Ind.Ct.App.2002) (quoting *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). " 'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude a "seizure" has occurred.' " *Id.* A seizure does not occur simply because a police officer approaches a person, asks questions, or requests identification. *Id.*

Courts examining the Fourth Amendment implications of the knock and talk procedure have held that a seizure occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' "

(Footnote omitted, some citations omitted).

Here, the evidence shows that Deputy Page responded to a report of a domestic disturbance at Chiszar's house. When he arrived, he found both Chiszar and L.G. outside in the front yard. While Deputy Page spoke with Chiszar outside, L.G. went inside and began packing her belongings. When Deputy Page had finished speaking with Chiszar, he told Chiszar that he was going inside to talk to L.G. Chiszar did not object, but asked Deputy Page whether he could go inside to be with his children.[2] Deputy Page told Chiszar that

---

2. Deputy Page initially testified that he had asked Chiszar's permission to go inside to talk to L.G. But on cross-examination, Deputy Page testified that he told Chiszar that he was

he could go inside the house, and Deputy Page also went inside to talk to L.G. Once inside, there is no evidence that Deputy Page conducted any search of the residence, but only talked to L.G. to get her version of events.

When Deputy Baer and Deputy Banes arrived, they entered the house and found Chiszar and his daughter sitting in the living room. Deputy Baer asked Chiszar where Deputy Page was, and Chiszar indicated that Deputy Page was down the hall in the master bedroom with L.G. Deputy Baer went to the bedroom, talked to Deputy Page briefly, and returned and asked Chiszar to go outside to talk with him. Once outside, Deputy Baer told Chiszar that he was not under arrest, and he asked for Chiszar's consent to search the garage. Chiszar gave his consent to that search. We hold that under those circumstances, a reasonable person would have felt at liberty to decline to give consent, ignore the police presence, and go about his business. *See id.* The knock and talk and subsequent consent to search did not violate the Fourth Amendment.

■■■ "The legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances." *Baxter*, 891 N.E.2d at 117 (quoting *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind.2005)). Although there may be other relevant considerations under certain circumstances, generally the reasonableness of a search or seizure turns on a balancing of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred; 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities;

and 3) the extent of law enforcement needs. *Id.* Here, when we balance the three factors under the facts and circumstances, as set out above, we hold that the deputies' conduct was reasonable and did not violate Chiszar's rights under Article I, Section 11 of the Indiana Constitution.

■■■ In the alternative, Chiszar also contends that the marijuana and paraphernalia deputies found were outside the scope of the consent he gave to Chiszar to search the garage. Because it comes within an established exception to the Fourth Amendment warrant requirement, the scope of the authority to search is strictly limited to the consent given, and a consensual search is reasonable only if it is kept within the bounds of that consent. *Pinkney v. State*, 742 N.E.2d 956, 960 (Ind.Ct. App.2001), *trans. denied.* The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness, in other words, "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* In addition, the scope of a consensual search is generally defined by its expressed object. *Id.* When reviewing the trial court's determination regarding the validity of a search, we consider the evidence favorable to the trial court's ruling and any uncontradicted contrary evidence. *Id.* The test is sufficiency of the evidence. *Id.*

■■■ Here, Chiszar gave the deputies consent to search the garage for a video camera and videotapes. In the course of that search, Deputy Banes found a paper bag inside a file cabinet. When Deputy Banes looked inside that bag, he found a

___

going inside. Either way, Chiszar did not object to Deputy Page's entry into his house at that time, and there is no suggestion that Deputy Page gained entry into the house by a

show of force or coercion of any kind. Indeed, L.G. asked Deputy Page to stay with her until she had packed her belongings and left the house because she did not feel safe.

baggie containing a leafy substance and paraphernalia. Deputy Banes asked Chiszar what it was, and Chiszar responded that it was marijuana. Chiszar does not deny that Deputy Banes rightfully looked inside the paper bag, as it might have contained a video camera and/or videotapes. Instead, Chiszar asserts that because his consent was limited to the video camera and videotapes, any other contraband found during the search for those objects cannot be used against him. We cannot agree. Deputy Banes found the marijuana and paraphernalia while searching the garage in a manner consistent with Chiszar's consent. Chiszar has not demonstrated that the deputies' search went beyond the scope of his consent.

### Issue Three: Probable Cause

Chiszar next contends that the search warrant deputies obtained after his arrest was not supported by sufficient probable cause. In *Cheever–Ortiz v. State,* 825 N.E.2d 867, 871–72 (Ind.Ct.App.2005), this court set out the standard of review and law regarding probable cause to support search warrants:

> In deciding whether to issue a search warrant, the task of the issuing judge is to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Query v. State,* 745 N.E.2d 769, 771 (Ind.2001) (citing [*Illinois v.*] *Gates* [, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ]; *Hensley v. State,* 778 N.E.2d 484, 487 (Ind.Ct.App.2002). The reviewing court is required to determine whether the issuing judge had a "substantial basis" for concluding that probable cause existed. *Query,* 745 N.E.2d at 771 (quoting *Gates,* 462 U.S. at 238–39 [103 S.Ct. 2317] ); *Hensley,* 778 N.E.2d at 487. A

substantial basis requires the reviewing court, with significant deference to the issuing judge's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination of probable cause. *Query,* 745 N.E.2d at 771; *Houser v. State,* 678 N.E.2d 95, 99 (Ind.1997). "A 'reviewing court' for these purposes includes both the trial court ruling on a motion to suppress and an appellate court reviewing that decision." *Query,* 745 N.E.2d at 771. In our review, we consider only the evidence presented to the issuing judge and may not consider post hoc justifications for the search. *Id.* (citing *Seltzer v. State,* 489 N.E.2d 939, 941 (Ind.1986)).

The Fourth Amendment to the United States Constitution, which is made applicable to the states by reason of the Fourteenth Amendment, protects citizens from unreasonable searches and seizures. *Creekmore v. State,* 800 N.E.2d 230, 233 (Ind.Ct.App.2003). The Fourth Amendment demands that no search warrant be issued unless it is supported by probable cause. *Id.* Probable cause is a fluid concept, which is decided based on the facts of each case. *Id.* " 'Probable cause to search premises is established when a sufficient basis of fact exists to permit a reasonably prudent person to believe that a search of those premises will uncover evidence of a crime.' " *Id.* (quoting *Esquerdo v. State,* 640 N.E.2d 1023, 1029 (Ind.1994)).

Probable cause to issue a search warrant cannot be supported by uncorroborated hearsay from an informant whose credibility is unknown. *Creekmore,* 800 N.E.2d at 234. I.C. § 35–33–5–2(b) requires that when a warrant is sought based on hearsay, an affidavit supporting the probable cause must either:

(1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or

(2) contain information that establishes that the totality of the circumstances corroborates the hearsay.

I.C. § 35–33–5–8 allows an exception to I.C. § 35–33–5–2 and permits a judge to receive the same information that would otherwise be included in this affidavit through sworn oral testimony.

The reliability of hearsay may be established if: (1) the informant has given correct information in the past; (2) independent police investigation corroborates the informant's statements; (3) some basis for the informant's knowledge is demonstrated; or (4) the informant predicts conduct or activities by the suspect that are not ordinarily predictable. *Jaggers* [*v. State*, 687 N.E.2d 180, 182 (Ind.1997)]; *Newby v. State*, 701 N.E.2d 593, 598 (Ind.Ct.App.1998). Depending on the facts, other considerations may come into play in establishing the reliability of the informant or the hearsay. *Jaggers*, 687 N.E.2d at 182. Further, as our Supreme Court has clarified:

Although we review de novo the trial court's substantial basis determination, we nonetheless afford 'significant deference to the magistrate's determination'. . . .

\* \* \*

[T]he heart of the matter is not whether a court of review agrees or disagrees about the existence of probable cause sufficient to support the issuance of a search warrant; rather the issue is whether when viewed from a totality of the circumstances there was enough evidence before the issuing court that would allow the court to make that call.

*Jackson v. State*, 908 N.E.2d 1140, 1142, 1144–45 (Ind.2009).

■ Here, Chiszar presents several arguments challenging the sufficiency of the probable cause affidavit. First, Chiszar maintains that the following statement does not constitute voyeurism under the statute: "Earlier today police went to the Chiszar residence because his girlfriend L.G. discovered him taping her, without her consent, while he was attempting to have sex with her." We hold that those facts do establish an allegation of voyeurism.

Next, Chiszar asserts that the court "was consistently not given a full and fair recitation of the facts as known to the affiant related to [L.G.]'s credibility." Brief of Appellant at 27. In particular, he maintains that the affidavit makes only a vague reference to "two tapes" found at his residence, without any explanation of what those tapes depicted. Chiszar contends that the deputies did "nothing to confirm or corroborate [L.G.]'s hearsay allegations." *Id.* And he argues that the affidavit impermissibly omitted his allegations that L.G. had attacked him and that "the only physical contact Chiszar had with her was to keep her from his camera." *Id.*

But the affidavit establishes L.G.'s credibility in that she had been dating Chiszar for approximately two years when she caught him videotaping her in a sexual manner without her consent, so she had first-hand knowledge of the instant crime. Further, the affiant had "viewed videotapes taken by Chiszar peeping into windows of houses viewing women in various states of undress[,]" which corroborated L.G.'s allegations. And the affiant stated that L.G. did not have a criminal history of

crimes of dishonesty. We hold that L.G.'s credibility was established and the recited facts were sufficient to support the probable cause determination.

Still, Chiszar contends that L.G.'s allegation that she had seen child pornography on Chiszar's computer was "pure hearsay, speculation and conclusion." Brief of Appellant at 27. Again, L.G.'s credibility was sufficiently established, and the affiant stated that L.G. had told him that she had seen "what she believes to be child pornography on his computer." In essence, Chiszar maintains that without specific details of what L.G. saw on his computer, L.G.'s statement is not enough to support a search warrant with respect to his computer. We reject Chiszar's suggestion that without some demonstration that L.G. knows what child pornography looks like, her statement is not sufficient to support a search of his computer. As Chiszar points out, child pornography is defined by statute as a depiction of sexual conduct by a child who is less than sixteen years old or who appears to be less than sixteen years old. *See* Ind.Code § 35–42–4–4(c). We disagree with Chiszar's characterization of L.G.'s statement as a mere legal conclusion. We hold that the statement was sufficient to establish probable cause for the search of Chiszar's computer.[3]

Chiszar challenges each remaining allegation contained in the probable cause affidavit as hearsay or speculation. But our review of the probable cause affidavit, as a whole, indicates both that L.G.'s credibility was established and that the affiant had corroborated L.G.'s statements with the affiant's knowledge of other similar conduct by Chiszar in the past. Given all the circumstances set forth in the affidavit, there was a fair probability that contraband or evidence of a crime would be found at Chiszar's residence. *See Query*, 745 N.E.2d at 771. We hold that the issuing magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant.

## Issue Four: Sufficiency of the Evidence

 Chiszar next contends that the State presented insufficient evidence to support his convictions for one count of voyeurism[4] and battery. When reviewing the claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Jones v. State*, 783 N.E.2d 1132, 1139 (Ind.2003). We look only to the probative evidence supporting the judgment and the reasonable inferences therein to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Id.* If there is substantial evidence of probative value to support the conviction, it will not be set aside. *Id.*

### Voyeurism

 Chiszar maintains that the evidence is insufficient to prove that he committed voyeurism with respect to L.G. To prove voyeurism as charged, the State was required to show that Chiszar knowingly and/or intentionally, with the use of a video camera, peeped into the undressing area of

---

**3.** Chiszar suggests that L.G.'s information was stale, since she reported having seen the child pornography on the computer in December 2007. But he does not make cogent argument on this point. Regardless, the United States Court of Appeals for the Seventh Circuit has held that "[i]nformation a year old is not necessarily stale as a matter of law, especially where child pornography is concerned." *United States v. Newsom*, 402 F.3d 780, 783 (7th Cir.2005).

**4.** Chiszar does not challenge the sufficiency of the evidence to support his conviction for voyeurism with respect to the victim L.B.

L.G. without her consent. *See* Ind.Code § 35–45–4–5(a)(1)(A). On appeal, Chiszar makes two contentions: 1) that the evidence cannot show that he peeped "into" a room where he was physically present; and 2) that L.G. implicitly consented to the videotaping. We address each contention in turn.

First, Chiszar asserts that a logical reading of the voyeurism statute makes clear that he could not have peeped "into" a room where he was physically present. But Chiszar's narrow interpretation of the word "into" would mean that a conviction for voyeurism by the use of a video camera could only stand if the video camera were set up at the doorway to a room or outside of the room looking in. That could not have been the Legislature's intent. The evidence shows that Chiszar set up the video camera inside the bedroom to record his sexual encounter with L.G. without L.G.'s knowledge or consent. Whether Chiszar was physically present in the room is irrelevant under the plain meaning of the statute.

Chiszar also contends that L.G. impliedly consented to the video taping since she was in a consensual sexual relationship with him. But, again, Chiszar misses the point. L.G.'s consent to engage in sexual intercourse with Chiszar bears no relationship to the specific consent necessary to be videotaped in that manner. And, as the State points out in its brief on appeal, Chiszar's reaction to L.G.'s discovery that he was videotaping her is sufficient to prove her lack of consent and his guilt. Chiszar grabbed the video camera and ran out of the bedroom and repeatedly denied that L.G. had even seen a video camera, let alone that he had videotaped her. The evidence is sufficient to show that L.G. did not consent to the videotaping, and the evidence is sufficient to support Chiszar's conviction on this count.

### Battery

■ To prove battery as charged, the State was required to show that Chiszar knowingly touched L.G. in a rude, insolent or angry manner resulting in bodily injury to her. *See* Ind.Code § 35–42–2–1(a)(1). On appeal, Chiszar contends that he used only reasonable force against L.G. "to defend himself and his camera" as permitted by Indiana Code Section 35–41–3–2(c), the defense of property statute. Brief of Appellant at 37. But Chiszar's contention amounts to a request that we reweigh the evidence, which we will not do. L.G. testified that Chiszar grabbed her by the hair, pulled her, and threw her into a car. L.G. also testified that Chiszar threw her into a kitchen island. L.G. further testified that she suffered pain and developed bruises on her arms, hands, back and stomach as a result of the battery. It was up to the trial court to determine whether the amount of force Chiszar used against L.G. in his effort to keep her from getting his video camera was reasonable under the circumstances.[5] The evidence is sufficient to support Chiszar's battery conviction.[6]

5. For purposes of this appeal, we need not determine the question of whether, under Indiana Code Section 35–41–3–2(c), Chiszar was justified in using any force against L.G. under the circumstances, where she was trying to take possession of videotape of her taken without her consent.

6. Chiszar asserts that the trial court improperly "made a domestic battery determination that has serious ramifications under the Sec-

ond Amendment's right to bear arms under the United States Constitution." Brief of Appellant at 38. But he does not direct us to the part of the record on appeal to support that assertion. The sentencing order clearly states that Chiszar was convicted of battery under Indiana Code Section 35–42–2–1(a)(1)(A). Chiszar has not preserved this issue for our review on appeal.

## Conclusion

Chiszar has not demonstrated that the voyeurism statute is unconstitutionally vague. The trial court did not abuse its discretion when it admitted evidence deputies obtained after Chiszar had consented to the search of his garage. There was probable cause to support the search warrant. And the State presented sufficient evidence to support Chiszar's convictions for one count of voyeurism and battery. Chiszar does not challenge the sufficiency of the evidence with regard to his other convictions.

Affirmed.

BAKER, C.J., and MATHIAS, J., concur.