**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

FILED

Feb 10 2014, 9:04 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**BRUCE C. BADE**
Bade and Bade
Hartford City, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LARRY K. CROUCHER II, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 05A02-1302-CR-172 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE BLACKFORD SUPERIOR COURT
The Honorable John Nicholas Barry, Judge
Cause No. 05D01-1203-FD-87

**February 10, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Following a jury trial, Larry K. Croucher II ("Croucher") appeals his conviction for maintaining a common nuisance,[1] a Class D felony. On appeal, Croucher raises the following consolidated and restated issue: whether the trial court erred in admitting evidence at trial that was obtained pursuant to a warrantless search.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In March 2012, Croucher lived with his girlfriend Meredith Collins ("Collins") and her seventeen-year-old daughter, B.C., in Collins's home ("the Collins home"), which was located on West Windsor Street in Montpelier, Indiana. Montpelier Police Officer Matthew Mansfield ("Officer Mansfield"), who had an arrest warrant for Collins's son Allen Lamb ("Lamb"), had been to the Collins home on prior occasions and knew that Lamb's family lived there.[2] *Tr.* at 22.[3] On the night of March 15, 2012, after learning from a known confidential informant that Lamb was at the Collins home, Officer Mansfield and

---

[1] *See* Ind. Code § 35-48-4-13(b).

[2] Blackford County Sheriff's Deputy James Heflin ("Deputy Heflin"), a law enforcement officer who joined Officer Mansfield in the arrest of Lamb, testified during the June 8, 2012 suppression hearing that he was also familiar with Lamb. Deputy Heflin stated that he had attempted to serve an "arrest warrant on him" two or three times, and one time "[Lamb's] brother allowed [us] in the house to confirm that he wasn't there." *Tr.* at 14.

[3] There are three volumes of transcripts in the record before us. Volume I, which contains the transcript of the June 8, 2012 hearing on Croucher's motion to suppress, is consecutively paginated with Volume II, which contains the transcript of the November 7, 2012 hearing. Therefore, we cite to those two volumes merely as *Tr*. Volume III is the transcript of a suppression hearing in a separate criminal action against Collins, Cause No. 05D01-1203-FD-95. While the pages of Volume III are numbered 1 through 78, that duplication in pagination is of no concern because we have not cited to that volume in this Memorandum Decision.

at least three other law enforcement officers surrounded the Collins home around 2:30 a.m.[4] From outside the residence, Officer Mansfield saw Lamb in the kitchen and called his name through the open kitchen window. Lamb, who had initially moved toward the window, turned and ran to a room in the back of the house. Officer Mansfield immediately went to the front door, which was ajar, and started knocking, declaring it was the police, "telling them to let [him] in," and saying he "just saw wanted subject. I know he's in there." *Id.* at 84. "Shining [his] light through the crack in the door [he could] see a couple pairs of legs standing there," and, "[a]s he pounded on the front door, it opened. *Id.*

After entering the Collins home, police looked for Lamb in several rooms. Lamb was arrested after police found him hiding in B.C.'s bedroom behind a dresser. On that dresser, and in plain view, Officer Mansfield saw items that he believed to be related to illegal drug use. Officer Mansfield spoke to B.C. because he believed she was involved with the drugs. During that conversation, Officer Mansfield noted that B.C. had scabs on her arms, a condition he recognized as being consistent with drug use. Officer Mansfield then asked Collins for permission to search her home for any other drug-related items. Collins told him to get a search warrant.

Other officers secured the premises, and Officer Mansfield went outside. While Officer Mansfield was talking on the phone trying to obtain a search warrant, Collins came outside and asked him how long it would take to obtain the warrant. Officer Mansfield said, "I told you before, you know, I have to get a search warrant and it's going to take

---

[4] From the record before us, it is not clear whether the officers went to the Collins home on March 15, 2012 or March 16, 2012.

quite a while to do this" . . . "unless you want to give me your consent." *Id*. at 93. Collins stated she would discuss it with Croucher and went inside her home. When she returned, about five minutes later, Collins agreed to sign a Consent to Search ("Consent Form").[5] Prior to signing the Consent Form, Officer Mansfield gave Collins a Miranda Warning, the text of which was contained in the Consent Form.[6]

During the search of the Collins home, police found "a number of drug related items in [Collins] and Croucher's bedroom. Specifically, police found pipes, burnt foil, coffee filters, marijuana, a vial containing a powdery substance, a razor blade, residue on a spoon, scales, a burnt marijuana cigarette, rolling papers, a grinder, remnants of marijuana, pills, and a rocky substance consistent with cocaine or methamphetamine." *Appellee's Br*. at 5 (citations omitted). Laboratory testing confirmed the presence of marijuana and methamphetamine. The State charged Croucher with Class D felony possession of methamphetamine, Class D felony maintaining a common nuisance, and Class A misdemeanor possession of marijuana.

Croucher filed a motion to suppress the evidence found in the Collins home. During a hearing held on June 8, 2012, Croucher argued that the evidence was obtained in violation

---

[5] The Consent provided, "I do not want a lawyer at this time. Knowing of my lawful right to refuse to consent to such a search, I willingly give my permission to the above named Deputy(s) to conduct a complete search of the listed property below, both inside and out." *State's Ex.* 1. The property listed below was the Collins home, a car, and "[a]ll containers, drawers, compartments in entirety of areas of inside residence [sic]." *Id*.

[6] Collins signed her name at the top of the Consent form (under the time), instead of where indicated at the bottom of the Consent. *State's Ex.* 1. Neither party, however, raises this irregularity nor do they contend that the placement of Collins's signature in any way invalidated the Consent. We note, however, that even if such a concern had been raised, where, as here, Collins signed her consent next to a designated "x," such a small irregularity would not have invalidated this Consent.

4

of the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution because, when police first entered the Collins home, although they had a warrant to arrest Lamb, the police did not have a search warrant.[7]  Croucher also argued that Collins's consent to search her home was not voluntarily given.  The trial court denied Croucher's motion to suppress and, over Croucher's objection, admitted the drug-related evidence at trial.  Following a jury trial, Croucher was convicted of Class D felony maintaining a common nuisance and acquitted of the other two counts.  The trial court sentenced Croucher to three years, of which one year was ordered executed and two years were suspended to probation.[8]  Croucher now appeals.

## DISCUSSION AND DECISION

Croucher filed two motions to suppress the drug-related evidence, but proceeded to trial after the trial court denied those motions.  Therefore, his sole claim on appeal is whether the trial court abused its discretion in admitting the evidence obtained during the warrantless search of the Collins home.[9]  *See Chiszar v. State*, 936 N.E.2d 816, 824 (Ind.

---

[7] Croucher also filed a motion to suppress contending that the confidential informant who entered the Collins home to confirm Lamb's whereabouts was acting as an agent of the police and, therefore, such entry without a search warrant was a constitutional violation.  The trial court denied Croucher's motion.  Croucher does not appeal the denial of this motion.  *Appellant's Br*. at 6.

[8] Following his sentencing, the trial court modified Croucher's sentence by placing him on house arrest.  Croucher has completed his house arrest and is now on probation pursuant to the sentencing order.  *Appellant's Br*. at 2.

[9] Once convicted, Croucher filed a motion to correct error contending that the trial court abused its discretion in admitting the drug-related evidence at trial.  The trial court denied Croucher's motion.  "Rulings on motions to correct error are typically reviewable under an abuse of discretion standard; however we review the matter *de novo* when the issue on appeal is purely a question of law."  *State v. Gonzalez-Vazquez*, 984 N.E.2d 704, 706 (Ind. Ct. App. 2013), *trans. denied.*  While Croucher makes no specific argument regarding the denial of his motion to correct error, our analysis here is the same.  That is, we must look to the constitutionality of the police search in order to decide whether the trial court abused its discretion when it admitted the evidence found in the Collins home.

Ct. App. 2010), *trans. denied*. "A trial court has broad discretion in ruling on the admissibility of the evidence." *Lee v. State*, 916 N.E.2d 706, 707 (Ind. Ct. App. 2009). "We will reverse a trial court's ruling on the admissibility of the evidence only for an abuse of discretion." *Id*. "An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court." *Id*. "We consider the evidence most favorable to the trial court's decision and any uncontradicted evidence to the contrary." *Id.* In reviewing the trial court's ultimate ruling on admissibility, we may consider the foundational evidence from the trial as well as evidence from the motion to suppress hearing that is not in direct conflict with the trial testimony. *Chiszar*, 936 N.E.2d at 824.

Croucher divides his argument into two parts, which we address in turn. First, he contends that the evidence was improperly admitted because the police illegally entered the Collins home to execute Lamb's arrest warrant. Second, he contends that Collins's consent to the search of her home was not voluntarily given.

1. Entry into the Collins Home without Search Warrant

When the home that officers seek to enter is not that of the subject of the arrest warrant, officers must obtain a search warrant absent exigent circumstances. *Duran v. State*, 930 N.E.2d 10, 16 (Ind. 2010) (citing *Steagald v. U.S.,* 451 U.S. 204, 216 (1981)). This court recently said:

> An arrest warrant founded on probable cause gives the police limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within. Thus, most jurisdictions require that the police have a reasonable belief that the dwelling is the residence of the subject of the warrant and that the subject is present at the time the officers

6

attempt to enter on authority of an arrest warrant. The belief is judged on the information available to the officers at the time of entry and need not prove to have been correct in hindsight. As one leading treatise summarized, it is generally accepted that reason to believe involves something less than probable cause.

*Carpenter v. State*, 974 N.E.2d 569, 572 (Ind. Ct. App. 2012), *trans. denied* (footnote omitted) (citations omitted) (internal quotation marks omitted).

Croucher first contends that the arrest warrant for Lamb did not give police the right to enter the Collins home, and therefore, the drug-related evidence from the home was obtained in violation of the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution. The Fourth Amendment in pertinent part provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. U.S. Const. amend. IV. This federal right to be free of unreasonable searches and seizures applies to the states through the Fourteenth Amendment." *Duran,* 930 N.E.2d at 14. The Indiana Constitution may protect searches that the federal Constitution does not. *State v. Washington*, 898 N.E.2d 1200, 1206 (Ind. 2008) (citing *State v. Moore,* 796 N.E.2d 764, 767 (Ind. Ct. App. 2003), *trans. denied*). Section 11 should be applied to protect people from unreasonable search and seizure. *Id.* (citing *Brown v. State,* 653 N.E.2d 77, 79 (Ind. 1995)). On appeal, however, Croucher does not distinguish between the provisions of the Federal and State constitutions. Instead, he argues that the trial court erred in concluding that the arresting officers had a reasonable belief that Lamb lived at the Collins home and that he was present on the morning of the arrest.

Croucher asserts that the State failed to introduce Lamb's arrest warrant as evidence

7

of Lamb's residence. The arrest warrant, however, would not have contained dispositive information regarding Lamb's residence. Under Indiana law, an arrest warrant is not required to specify the address of the person to be arrested. *See* Ind. Code § 35-33-2-2. Here, there was other evidence to support the arresting officers' belief that Lamb lived at the Collins home. During the June 8, 2012 suppression hearing, Officer Mansfield testified that he had been to the Collins home on prior occasions, and that he knew that Collins was Lamb's mother and knew that Lamb's family lived there. *Tr.* at 22. Blackford County Sheriff's Deputy James Heflin ("Deputy Heflin"), a law enforcement officer who joined Officer Mansfield in the arrest of Lamb, testified that he was also familiar with Lamb. Deputy Heflin stated that he had attempted to serve an "arrest warrant on him" at the home two or three times, and one time "[Lamb's] brother allowed [us] in the house to confirm that he wasn't there." *Id.* at 14. Additionally, Lamb's presence in the kitchen of the Collins home around 2:30 a.m. on the day in question, bolstered the officers' reasonable belief that Lamb was not a visitor, but instead used his mother's home as a place to live. Lamb's presence in the kitchen, a presence the trial court believed the State had proven, likewise supported the officers' reasonable belief that Lamb was home on the night in question. From this evidence, we find that the officers had a reasonable belief that the Collins home was Lamb's residence.

Regarding the serving of the arrest warrant, Indiana Code section 35-33-2-3 provides that a "warrant may be served or arrests on it made: (1) by any law enforcement officer; (2) on any day of the week; and (3) at any time of the day or night." Ind. Code § 35-33-2-3(a). That section additionally provides that "[a] law enforcement officer may

break open any outer or inner door or window in order to execute an arrest warrant, if the officer is not admitted following an announcement of the officer's authority and purpose." Ind. Code § 35-33-2-3(b). Here, Officer Mansfield announced through the cracked door that he was serving an arrest warrant on Lamb. When no one answered the door, and Officer Mansfield observed movement inside the home, it was reasonable for him to enter in pursuit of Lamb, who Officer Mansfield had observed moving from the kitchen to the back of the house. *See Weddle v. State*, 989 N.E.2d 371, 375 (Ind. Ct. App. 2013) ("When executing an arrest warrant, a law enforcement officer may break open any outer or inner door or window, if he is not admitted inside following an announcement of authority and purpose."), *aff'd on reh'g*, 997 N.E.2d 45 (2013). Because the officers legally entered the Collins home, the trial court did not abuse its discretion in admitting the evidence found in plain view during the execution of that arrest warrant.

## 2. Consent

Croucher next contends that Collins's consent to search was involuntarily given, and, therefore, the trial court erred when it admitted the drug-related evidence found pursuant to that search. Generally, a search warrant is a prerequisite to a constitutionally proper search and seizure. *Navarro v. State*, 855 N.E.2d 671, 675 (Ind. Ct. App. 2006). In cases involving warrantless searches, the State bears the burden of proving an exception to the warrant requirement. *Id.* A valid consent to search is an exception to the warrant requirement. *Callahan v. State*, 719 N.E.2d 430, 434 (Ind. Ct. App. 1999). The theory underlying this exception is that, when an individual gives the State permission to search

either his person or property, the governmental intrusion is presumably reasonable. *Navarro*, 855 N.E.2d at 675.

When the State relies upon a defendant's consent to justify a warrantless search, it has the burden of proving that the consent was, in fact, freely and voluntarily given. *Id.*

> The voluntariness of a consent to search is a question of fact to be determined from the totality of the circumstances. A consent to search is valid except where it is procured by fraud, duress, fear, intimidation, or where it is merely a submission to the supremacy of the law. To constitute a valid waiver of Fourth Amendment rights, a consent must be the intelligent relinquishment of a known right or privilege. Such waiver may not be conclusively presumed from a verbal expression of assent unless the court determines, from the totality of the circumstances, that the verbal assent reflected an understanding, uncoerced, and unequivocal election to grant the officers a license which the person knows may be freely and effectively withheld. Knowledge of the right to refuse a search is one factor which indicates voluntariness.

*Id.* (internal citations omitted).

The "totality of the circumstances" from which the voluntariness of a defendant's consent is to be determined includes, but is not limited to, the following considerations:

> (1) whether the defendant was advised of his Miranda rights prior to the request to search; (2) the defendant's degree of education and intelligence; (3) whether the defendant was advised of his right not to consent; (4) whether the detainee has previous encounters with law enforcement; (5) whether the officer made any express or implied claims of authority to search without consent; (6) whether the officer was engaged in any illegal action prior to the request; (7) whether the defendant was cooperative previously; and (8) whether the officer was deceptive as to his true identity or the purpose of the search.

*Id.* Croucher maintains that Collins's consent was not voluntarily given because she signed the consent to search: (1) under duress of lack of sleep; (2) after she was misinformed by the police that a warrant was on the way; and (3) after police performed the illegal act of

10

entering the Collins home to execute Lamb's arrest warrant. The facts before the trial court disclose that Officer Mansfield and his fellow officers legally entered the Collins home to execute an arrest warrant for Lamb. While inside, they saw drug-related evidence in plain view. *Tr*. at 8, 37. Officer Mansfield told Collins what he had found and asked Collins for consent to search the residence. *Id*. at 38. Collins initially refused to consent to the search. *Id*. Officer Mansfield then went outside to begin the process of obtaining a search warrant.

There is some dispute regarding the amount of time that passed between Collins's first refusal and her final consent to search; however, it is clear that Collins was the one who initiated the conversation with Officer Mansfield that resulted in Collins giving her consent to search.[10] Collins, who was agitated about the length of time it was taking to obtain the warrant, approached Officer Mansfield outside and asked him how much longer the process would take. *Appellant's App*. at 15. When told it would take a while longer,

---

[10] During trial, the trial court expressed concern regarding "the supremacy of law," *i.e.*, whether the officer made any express or implied claims of authority to search the Collins home without consent. *Tr*. at 98. Croucher does not address that issue on appeal; instead, he questions the period of time that passed between Collins's initial refusal to consent and her having signed the consent to search. *Appellant's Br*. at 15-16; *Appellant's Reply Br*. at 6. We note, however, that the success of a supremacy of law argument, even if made, would have been doubtful based on the following offer of proof made by the State when questioning Officer Mansfield at trial:

> Q:   Okay. At any point were you threatening her that go ahead and give us consent or we're going to get a search anyways, it's not going to make any difference, I mean, how were you, how were you presenting this to her?
> A:   No, I was just letting them know that this is, this will have to be the process.
> Q:   Okay. Once you told her if we, if you don't give us consent we'll have to go get a search warrant, ah, and she said go get your search warrant, did you argue with her?
> A:   No.
> Q:   At that point did you then go and call a Prosecutor or Deputy Prosecutor?
> A:   Yes I did.

*Tr*. at 104.

11

but that things would go faster if she gave her consent, Collins went inside to confer with Croucher. When Collins returned, she said she was willing to consent. Officer Mansfield read Collins her Miranda rights, and Collins signed a consent, which provided: "I do not want a lawyer at this time. Knowing of my lawful right to refuse to consent to such a search, I willingly give my permission to the above named Deputy(s) to conduct a complete search of the listed property below, both inside and out." *State's Ex.* 1.

Here, there is no argument that Collins was afraid or under duress. Officer Mansfield and the other officers entered the Collins home for the legal purpose of arresting Lamb pursuant to an arrest warrant. After seeing drug-related evidence in plain view, Officer Mansfield asked Collins for consent to search the rest of the home. Collins knew of her right to refuse to consent and initially did so. Prior to signing the Consent, Officer Mansfield advised Collins of both her Miranda rights and her right to refuse to consent to the search. While Officer Mansfield stated that the search could be accomplished more quickly without obtaining a warrant, he never claimed he had authority to search the Collins home without either Collins's consent or a valid search warrant. When Collins finally consented to the search it was only after she had taken the opportunity to discuss the matter with Croucher. Under these facts and circumstances, we cannot say that the trial court erred in concluding that Collins's consent was voluntary.

The admission of the drug-related evidence was within the discretion of the trial court and can only be reversed upon a finding that the trial court abused that discretion. Here, the police entered the Collins home with a valid warrant for Lamb, who they reasonably believed lived and was present at the residence. Furthermore, their search of

the Collins home was made pursuant to Collins's voluntary consent.  Under the facts of this case, the trial court did not abuse its discretion in admitting the drug-related evidence found in the Collins home; accordingly, we affirm Croucher's conviction.

Affirmed.

FRIEDLANDER, J., and BAILEY, J., concur.