Megan MORRIS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 34A04–0611–CR–669.

Court of Appeals of Indiana.

Aug. 16, 2007.

Stephanie C. Doran, Kokomo, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Zachary J. Stock, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Megan Morris appeals her convictions for Class A felony battery and Class A felony child neglect. We reverse.

### Issue

The restated issue before us is whether the trial court properly admitted Morris's statements to police into evidence.

### Facts

On March 12, 2005, Kokomo Police Department officers were dispatched to the home of Morris and her fiancé, Kent McCarter, in response to a call about a child who had died while they were babysitting. There, they found eight-month old Romeo Randolph deceased. During the initial police investigation that night, Morris gave a statement in which she said only that she had discovered Romeo not breathing and called 911. On March 15, 2005, an autopsy revealed that Romeo had died from blunt force trauma to the head, which most likely was inflicted within a few hours of death. He would have been in the exclusive care of Morris and McCarter at that time.

After learning of the autopsy results, Lieutenant Donald Whitehead of the Kokomo Police Department went to Morris and McCarter's home asking that they come to the police station to review their initial police statements and to speak with him further about Romeo's death. At this time, Lieutenant Whitehead considered Morris one of two primary suspects in the death. Morris told Lieutenant Whitehead that she had talked to an attorney who advised her not to speak with the police. Lieutenant Whitehead then left, but shortly thereafter called Morris's mother, Lou Ann Hudson, and asked her to come to the police station and review Hudson's initial statement to police following Romeo's death. Hudson told Morris that the police were wanting them to come to the station and review their statements.

Hudson, Morris, and McCarter then went to the police station, sometime between 1:30 p.m. and 2:40 p.m. Lieutenant Whitehead was surprised to see Morris

there, since she had just said counsel had advised her not to speak to the police. However, Lieutenant Whitehead recalled that when he asked Morris about her previous refusal to speak to him, "she insisted that it was OK, or that she wanted to talk to me. . . ." Tr. p. 12.

Lieutenant Whitehead led Morris to a seven by eight foot interview room with a two-way mirror and no windows, located in a section of the police station that was separated from the lobby and locked from the outside, but was not locked from the inside. Additionally, the doors to the interview rooms as a rule were never locked. However, there is no evidence in the record that this information regarding the locks on the interview room or main entrance doors was communicated to Morris. After taking Morris to the room, Lieutenant Whitehead told her that she was not under arrest, was under no obligation to be there, and was free to leave at any time. He did not give *Miranda* warnings to her.

Lieutenant Whitehead spoke to Morris for approximately twenty minutes. He informed Morris of the autopsy results and told her that she was facing possible neglect charges. Morris did not waver from her initial statement to the police on March 12. Lieutenant Whitehead then gave Morris a copy of her initial statement to read and sign and left the room.

While Lieutenant Whitehead was gone, Morris overheard part of McCarter's interview being conducted and became visibly upset. Morris got Lieutenant Whitehead's attention by knocking on the interview room door from the inside because she did not know it was unlocked and that she could open it.[1] She asked if she could leave, and he escorted her to the front of the station. Lieutenant Whitehead then informed Captain Greg Davis that Morris had not varied from her previous statement.

Morris walked out of the station and to the parking lot. She began to walk home because the car Hudson had driven to the police station was locked and Hudson and McCarter were still inside the station. Captain Davis came out of the station and asked to speak with her, saying that he wanted to get the case resolved. He told Morris that she was free to leave, but that "it was in the best interest for her to come back so we could get to the bottom of the death of this child." Tr. p. 462. Captain Davis and Morris spoke outside the station for about five to ten minutes, then spoke in the station lobby for another fifteen or twenty minutes. Finally, he led Morris to an office with windows in the secure part of the police station, but not an interview room, where he talked to her further. He did not advise her of her *Miranda* rights.

During this interview, Morris stated that Romeo had accidentally hit his head on a bed guardrail. At the outset of a recorded statement, taken at 4:55 p.m., Captain Davis asked Morris, "Okay, have I promised you anything?" Ex. A, p. 2. Morris responded, "Only that I could go home." *Id.* At the conclusion of this statement, Captain Davis said, "Have I ever told you, you couldn't leave?" *Id.* at 25. Morris responded, "No, but you said it was in my best interest to."[2] *Id.* Captain Davis took a second, brief recorded statement at 5:45

---

1. Whitehead could not recall how Morris had gotten his attention; Morris testified that she had knocked on the door. We consider Morris's testimony to be uncontradicted, in accordance with the standard of review we will delineate later in the opinion.

2. It seems clear, in the context in which Morris made this statement and based on Captain Davis's testimony at the suppression hearing, that Morris meant to say that she had been told it was in her best interest to talk to Captain Davis.

p.m. Again, he asked Morris at the outset, "have I made you any promises?" Ex. B, p. 2. Morris responded, "Only to go home." *Id.* At a suppression hearing, Captain Davis agreed that he had assured Morris "that she'd be permitted to go home ... if she cooperated. ..." Tr. p. 46.

Sergeant Heath Haalck also was present during part of this interview, specifically the second recorded statement. At the completion of this statement, Captain Davis led Morris to the police station lobby, where she was waiting for McCarter and Hudson to complete their interviews with police. Sergeant Haalck, however, wanted to speak further with Morris. He went to the lobby and requested that she return behind the secured area of the station a third time for an additional interview. He advised Morris that she was not under arrest and was free to leave, but did not advise of her of her *Miranda* rights.

Morris accompanied Sergeant Haalck to one of the seven by eight foot interview rooms. She was not placed in handcuffs. Sergeant Haalck and Morris talked in the interview room from 5:50 p.m. to 6:30 p.m. He began telling her that based on the autopsy reports, there was no way that Romeo's head wound had been accidentally inflicted, as Morris had indicated in her statement to Captain Davis. Morris then stated that she had struck Romeo in the back of the head with her fist.

At 6:34 p.m., Morris was given *Miranda* warnings for the first time and signed a waiver of rights form. She then gave a recorded statement, at 7:00 p.m., in which she reiterated that she had become frustrated with Romeo's crying and had struck him on the back of the head with her fist.

After giving this statement, Morris was allowed to leave the police station. She was arrested the next day, March 17, at her residence.

The State charged Morris with Class A felony battery, Class A felony child neglect, and Class C felony involuntary manslaughter. Morris moved to suppress her statements to police, alleging violation of her *Miranda* rights. The trial court denied the motion. At trial, Morris renewed her objection to the introduction of her statements to Sergeant Haalck, which the trial court overruled.[3] A jury found her guilty as charged. The trial court entered judgment of conviction and sentences only for Class A felony battery and Class A felony child neglect. Morris now appeals.

### Analysis

Morris reiterates the arguments made in connection with her motion to suppress, namely that her statements to Sergeant Haalck implicating herself in Romeo's death were obtained in violation of her *Miranda* rights. Morris did not attempt to initiate an interlocutory appeal from the denial of her motion to suppress and instead proceeded to trial. Thus, the issue is whether the trial court abused its discretion by admitting the evidence at trial. *See Bentley v. State,* 846 N.E.2d 300, 304 (Ind.Ct.App.2006), *trans. denied.* A trial court has broad discretion in ruling on the admissibility of evidence and we will reverse such a ruling only for an abuse of that discretion. *Id.* An abuse of discretion generally occurs when a decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* "But to the extent a ruling is based on an error of law or is not supported by the evidence

---

**3.** Morris objected at the beginning of Sergeant Haalck's testimony relating her statements to him; she did not object during the testimony of Lieutenant Whitehead and Captain Davis. Thus, on appeal we address only the admissibility of Morris's statements to Sergeant Haalck, which in any event were the only clearly inculpatory statements in this case.

it is reversible, and the trial court has no discretion to reach the wrong result." *Pruitt v. State*, 834 N.E.2d 90, 104 (Ind. 2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 2936, 165 L.Ed.2d 962 (2006).

◾ Because a suppression hearing was held in this case, along with trial testimony related to the circumstances surrounding Morris's statements to police, "we will consider the foundational evidence from the trial as well as the evidence from the motion to suppress hearing which is not in direct conflict with the trial testimony." *Kelley v. State*, 825 N.E.2d 420, 427 (Ind. Ct.App.2005). Additionally, we will consider uncontradicted evidence from the motion to suppress hearing that is favorable to the defendant and that has not been countered or contradicted by foundational evidence offered at the trial. *Id.* at 426.

◾ "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). "Custodial interrogation" means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. *Id.*, 86 S.Ct. at 1612. Prior to any custodial interrogation, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*, 86 S.Ct. at 1612. Statements elicited in violation of *Miranda* generally are inadmissible in a criminal trial. *Loving v. State*, 647 N.E.2d 1123, 1125 (Ind.1995).

◾ There is no question in this case that Sergeant Haalck's discussions with Morris constituted "interrogation." The dispositive issue here is whether Morris was "in custody" at that time. To be in custody, the defendant need not be placed under formal arrest. *King v. State*, 844 N.E.2d 92, 96 (Ind.Ct.App.2005). Rather, a person is in custody if a reasonable person under the same circumstances would have believed that he or she was under arrest or not free to resist the entreaties of the police. *Clark v. State*, 808 N.E.2d 1183, 1193 (Ind.2004). A custody determination involves an examination of all the objective circumstances surrounding the interrogation. *King*, 844 N.E.2d at 96. An officer's knowledge and beliefs are relevant to the question of custody only if they are conveyed—through words or actions—to the person being questioned. *Id.* "The test is how a reasonable person in the suspect's shoes would understand the situation." *Id.* at 96–97. Also relevant is the length of the detention and questioning. *See Clark*, 808 N.E.2d at 1193.

The State contends this case is controlled by *Luna v. State*, 788 N.E.2d 832 (Ind.2003). There, police asked a suspect in a child molestation to come to the police station to discuss the case. The defendant/suspect drove himself to the station, and was told by the police that he did not have to talk to them, was not under arrest, and was free to leave at any time. After speaking with police for about thirty-five minutes in an office and denying any culpability, an officer told the defendant that he thought he was lying. The defendant then admitted the allegation and then was allowed to leave the station. The entire interaction with the police lasted for about one hour.

After being convicted of Class A felony child molestation, this court reversed the defendant's conviction after holding that his interview at the police station constitut-

ed "custodial interrogation" and the police had erred in not advising him of his *Miranda* rights. The author of this opinion dissented, noting that the defendant had been allowed to leave after the interview and stating, " 'I believe the proof is in the pudding here.' " *Luna,* 788 N.E.2d at 833 (quoting *Luna v. State,* No. 79A02-0201-CR-33, slip op. at 8, 775 N.E.2d 404, (Ind. Ct.App. Sept. 17, 2002) (Barnes, J., dissenting)). Our supreme court affirmed the defendant's conviction, concluding that his statement to police had been properly admitted. *Id.* at 835. The court held, "a person who goes voluntarily for a police interview, receives assurances that he is not under arrest, and leaves after the interview is complete has not been taken into 'custody' by virtue of an energetic interrogation so as to necessitate *Miranda* warnings." *Id.* at 834 (citing *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). The court also overruled *Dickerson v. State,* 257 Ind. 562, 276 N.E.2d 845 (1972), to the extent that case had held that the fact than an interrogation takes place in a "coercive environment" is sufficient to render a suspect in custody for *Miranda* purposes. *Id.* at 834–35.

If the admissibility of Morris's first statements to Lieutenant Whitehead was at issue here, or possibly even her statements to Captain Davis, we might agree that Luna was indistinguishable and controlling. However, Morris was subjected to three police interviews and was at the station for several hours before she finally confessed.

It was only after the third and final interview with Sergeant Haalck and after Morris confessed that she was indeed left alone to leave the station, after having spent upwards of five or six hours there. After the first and second interviews, she either began to leave the station or waited in the lobby for her mother and fiancé to complete their interviews, only to be approached again by a police officer wanting to speak with her. After the second interview, which was obtained after Morris was told that it would be in her "best interest" to speak, and which was obtained in part based on the promise that Morris would be able to go home afterwards, she nevertheless was approached yet again and asked to talk further. Tr. p. 462. At this point, a reasonable person who has been repeatedly approached by police to come with them to give a statement, after having already been promised that he or she could leave after giving an earlier statement, might not feel free to resist the entreaties of the police. In other words, the person might reasonably feel a police officer's assurance that he or she is free to leave at any time to be a hollow promise, i.e. that officers would continue approaching him or her and asking to talk until they obtained the information they wanted. *Cf. Cliver v. State,* 666 N.E.2d 59, 66 (Ind.1996) (holding defendant was not in custody where, after giving statement, the defendant became agitated and "left the police station without interference."). Morris testified that she did not feel free to decline Sergeant Haalck's request to talk some more, "Because ever [sic] time I tried to leave they kept coming after me." Tr. p. 95. That appears to us to have been a reasonable conclusion.

Contrary to concluding *Luna* is controlling here, we think this case bears some similarities to our supreme court's decision in *Sellmer v. State,* 842 N.E.2d 358 (Ind. 2006). *Sellmer* addressed whether a defendant was in custody when she gave consent to police to search her car and, thus, whether she was entitled to be advised of her right to consult with counsel before consenting to the search under *Pirtle v. State,* 263 Ind. 16, 323 N.E.2d 634 (1975). *Sellmer,* 842 N.E.2d at 362–63. The court applied the same "custody" test that applies to *Miranda* custody questions,

namely "whether a reasonable person under the same circumstances would believe that she was under arrest or not free to resist the entreaties of the police." *Id.* at 363.

The facts in *Sellmer* were that a police officer approached the driver of a car, who had parked in a public parking lot, and requested consent to search the car after having received an anonymous tip that it might contain drugs. There is no indication the officer ever handcuffed or otherwise physically restrained the driver. However, the officer asked for permission to search the car three to five times, asked the driver incriminating questions, told the driver that it was in her best interests to consent to the search, failed to advise the driver that she had the right to refuse consent despite her repeated questions as to whether she had to consent, and told the driver that if she consented to the search and nothing was found, then she would be permitted to leave. Applying a "totality of the circumstances" test, the *Sellmer* court held that the driver was in custody at the time she finally consented to a search of her car. *Id.* at 365. Pursuant to *Sellmer,* then, the mere fact that a person is not placed in handcuffs or otherwise physically restrained by the police does not necessarily mean a person is not in custody. Rather, a totality of the circumstances test is applied.

Similar to *Sellmer,* Morris was told that it was in her best interests to cooperate with the police and submit to interviews with them. Obviously, she also was asked a number of potentially incriminating questions, and in fact was told by Lieutenant Whitehead that she likely was facing criminal neglect charges. Unlike in *Sellmer,* we acknowledge Morris was told by all three officers who interviewed her that she was free to leave if she wanted to, which clearly weighs against a finding that she was in custody when she spoke to Sergeant Haalck. However, whereas the police-citizen encounter in *Sellmer* took place in a public parking lot, and also apparently within a short, concentrated amount of time, Morris had been at the police station talking to law enforcement officers for several hours when she finally accompanied Sergeant Haalck to an interview room and gave her confession. Additionally, although the State makes much of the fact that neither the interview room doors nor the door leading out from the secured area of the police station were locked from the inside, it is unclear how this would be readily apparent to a layperson who on three previous occasions had been led through a locked door into the inner part of the station and on two previous occasions had been escorted back out to the lobby by a police officer.

Also, it is clear from the recordings of Morris's statements to Captain Davis that she very much wanted to go home after talking to him, and that indeed he had promised that she could go home after she finished talking to him. Nonetheless, after finishing talking to Captain Davis and while waiting in the lobby waiting for her mother and fiancé to leave, Sergeant Haalck asked again to talk to her. This was a direct violation of Captain Davis's earlier promise to her. Given the totality of the circumstances, this is the final straw that leads us to the conclusion that a reasonable person in Morris's position would not have felt free to resist the entreaties of the police at that time, and that she was in custody when she gave her statements to Sergeant Haalck.

Morris should have been advised of her *Miranda* rights when Sergeant Haalck began his interview of her, but she was not. Morris implicated herself in Romeo's death, she then was Mirandized, and she repeated that confession in a taped statement. Clearly, Morris's pre-*Miranda,* unrecorded statement is inadmissi-

ble. As for the post-*Miranda*, recorded statement, its admissibility is governed by *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). *Seibert* disapproved of "question first-warn later" interrogation techniques whereby a person in custody is interrogated without *Miranda* warnings, the person confesses, and the police only then Mirandize the person and record the confession. The Supreme Court held that *Miranda* warnings "will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." *Seibert*, 542 U.S. at 613, 124 S.Ct. at 2610. The State does not argue that Morris's post-*Miranda* interrogation was not close in time or not similar in content to her pre-*Miranda* interrogation; it focused solely on whether Morris was in custody at the time. Having rejected the State's argument on that point, *Seibert* clearly precludes the admission of Morris's post-*Miranda*, recorded statements.

■ The State also makes no argument that admission of Morris's statements to Sergeant Haalck constituted harmless error, nor do we see how it possibly could be. Therefore, we must reverse her convictions. Because there is no claim that there was insufficient evidence to convict, Morris may be retried. *See Camm v. State*, 812 N.E.2d 1127, 1138 (Ind.Ct.App. 2004), *trans. denied.*

### Conclusion

The trial court improperly admitted Morris's inculpatory statements to Sergeant Haalck into evidence. We reverse her convictions.

Reversed.

NAJAM, J., and RILEY, J., concur.