**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**MICHAEL R. FISHER**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

FILED

Feb 22 2012, 9:14 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

JAMES INGRAM,                           )
                                        )
    Appellant-Defendant,                )
                                        )
          vs.               )    No.  49A02-1106-CR-578
                                        )
STATE OF INDIANA,                       )
                                        )
    Appellee-Plaintiff.                 )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Carol J. Orbison, Judge
Cause No. 49G22-1006-CR-578

**February 22, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-defendant James Ingram appeals his conviction for Voluntary Manslaughter,[1] a class A felony. Specifically, he argues that the trial court erred when it admitted into evidence his recorded statement obtained by police without properly being advised of his Miranda[2] rights. He also argues that the evidence is insufficient to support his conviction. Finding that Ingram's statement was properly admitted into evidence and concluding that the evidence was sufficient, we affirm the judgment of the trial court.

FACTS

This case involves the intersection of two police investigations regarding separate crimes reported on the same morning and occurring about a block apart. Early in the morning of April 9, 2010, Ingram called 911 to report thefts from his and his neighbor's cars parked outside his house on Madiera Street in Indianapolis. Around that same time, Jesus Soto-Lopez, who resided at a residence on East Morris Street, was awakened when he heard someone fall on his front porch. Soto-Lopez found a white male bleeding and leaning against his front door. Soto-Lopez went to a nearby fire station to seek help for the injured man.

At approximately 4:00 a.m., Indianapolis Metropolitan Police Department (IMPD) Officer Zach Mauer was the first police officer to arrive at the Morris Street address, but the man, whom he recognized as Virgil Lucas, was already dead. At approximately 4:20

---

[1] Ind. Code § 35-42-1-3.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

a.m., IMPD Detective Jeffrey Wager of the homicide section arrived at the Morris Street residence and called for crime scene specialists to assist in the investigation.

IMPD Officer Nicole Hopkins also responded to the report of a crime at the Morris Street residence. While there, she noticed a run was still pending on Ingram's theft report, which was on the next street over. At approximately 4:30 a.m., she drove to Ingram's residence and spoke with him about the theft report. Ingram informed her that his vehicle and his neighbor's had been broken into, he observed a white male, he yelled at the man to drop what the man was holding, chased the man down an alley, and recovered a box of items that the man dropped when he fled. Officer Hopkins noticed that Ingram appeared nervous, surmised that there may be a connection between the theft and the death of Lucas, and called for the detectives.

At approximately 5:50 a.m., Ingram agreed to travel to the homicide office in the City-County building to speak with detectives. Detective Wager began to question Ingram at approximately 7:55 a.m. Prior to reading Ingram his <u>Miranda</u> rights, Ingram responded to questions about the incident at his house and, when asked, admitted to owning a handgun. Thereafter, Detective Wager advised Ingram of his <u>Miranda</u> rights and presented him with a waiver of rights form. Ingram did not sign the form, but stated to Detective Wager that he understood his rights. Then, Ingram admitted to firing a warning shot into the air because he believed that his life was in danger.

As a result of Ingram's statement, the police obtained a search warrant for Ingram's residence. They recovered Ingram's handgun and associated magazines. They

3

also found a spent shell casing that matched the casings of other cartridges found with Ingram's handgun, approximately one-hundred feet from the front of Ingram's house.

The autopsy revealed that Lucas died of a single gunshot wound to his back. Dr. Thomas Sozio, a Marion County Coroner, found the wound to be concentric in nature, indicating that the bullet likely followed a direct path from the gun to Lucas's back.

The State charged Ingram with class A felony voluntary manslaughter. Ingram filed a motion to suppress his statement on the grounds that he was not advised of his Miranda rights prior to Detective Wager initiating questioning.

The trial court held a hearing on the motion to suppress. At the hearing, Detective Delbert Shelton, an IMPD homicide detective, testified that Ingram voluntarily accompanied him to the homicide office. Ingram rode in the front passenger seat of the vehicle and was neither handcuffed nor searched for weapons. Detective Shelton took Ingram to the homicide office in the City-County building, and both men entered through the main public entrance. Detective Shelton never told Ingram that he was not under arrest or that he could leave at anytime.

Ingram was placed in an interrogation room, and the doors to the interrogation room automatically locked when shut. The room was carpeted on all four walls with chains permanently affixed to a wall to further restrain an individual. Ingram remained in the room by himself for two hours prior to questioning. Detective Wager testified that he did not read Ingram his Miranda rights at the outset of questioning because he did not consider Ingram a suspect. Finding inconsistencies in Ingram's answers, Detective

4

Wager decided to "Mirandize" Ingram at approximately thirty-six minutes into questioning. Following the hearing, the trial court denied Ingram's motion to suppress.

At trial, the trial court overruled Ingram's objection to the admission of the recorded statement. The jury found Ingram guilty as charged. Ingram now appeals.

DISCUSSION AND DECISION

I. Admission of Recorded Statement

Ingram contends that the trial court erred when it admitted into evidence his recorded statement on two grounds. First, he argues that his statements made prior to the Miranda warning were inadmissible because they resulted from a custodial interrogation in violation of Miranda. The State counters that Ingram was not "in custody" at the time he made the pre-Miranda statements, and, therefore, he cannot invoke the protections of Miranda. Second, Ingram argues that his statements made after receiving the Miranda warning are inadmissible because he was questioned first and "Mirandized" later in violation of Missouri v. Siebert, 542 U.S. 600 (2004). We address these contentions separately.

Although Ingram filed a motion to suppress the challenged evidence, he proceeded to trial after denial of those motions; thus, the sole claim now is whether the trial court abused its discretion in admitting his statements into evidence. Chiszar v. State, 936 N.E.2d 816, 824 (Ind. Ct. App. 2010). An abuse of discretion occurs if a decision is clearly against the logic and effect of the facts and circumstances before the court. Id. In reviewing the trial court's ultimate ruling on admissibility, we may consider the

5

foundational evidence from the trial as well as evidence from the motion to suppress hearing that is not in direct conflict with the trial testimony. Id.

In Miranda, the United States Supreme Court held that when law enforcement officers question a person who has been "taken into custody or otherwise deprived of his freedom of action in any significant way," the person must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444; see also Luna v. State, 788 N.E.2d 832, 833 (Ind. 2003). Statements given in violation of Miranda are normally inadmissible in a criminal trial. Morris v. State, 871 N.E.2d 1011, 1016 (Ind. Ct. App. 2007). "Miranda warnings do not need to be given when the person questioned has not been placed in custody." Johansen v. State, 499 N.E.2d 1128, 1130 (Ind. 1986).

Ingram first contends that the trial court erred when it admitted his statements made prior to the Miranda warnings because they resulted from an alleged custodial interrogation. In determining whether a person was in custody or deprived of freedom such that Miranda warnings are required, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Luna, 788 N.E.2d at 833 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). We will make this determination by examining whether a reasonable person in similar circumstances would believe he is not free to leave. Id. We will examine all the circumstances surrounding an interrogation, and are concerned with

6

objective circumstances, not upon the subjective views of the interrogating officers or the subject being questioned. Gauvin v. State, 878 N.E.2d 515, 520 (Ind. Ct. App. 2007). In order to conclude that the defendant was indeed seized at the time of the statement, we must find that the officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen. Jones v. State, 866 N.E.2d 339, 342-43 (Ind. Ct. App. 2007).

In this case, Ingram initiated contact with the police when he called 911 and discussed the theft incident with officers when they arrived at his residence. Ingram then expressly and voluntarily agreed to accompany officer to the homicide office for questioning. Tr. p. 511. Ingram rode unrestrained in the front passenger seat of Detective Shelton's unmarked police car. Id. at 510. At the City-County building, Detective Shelton walked Ingram through the public access entrance. Id. at 512. At no point prior to or during questioning was Ingram handcuffed or searched. Tr. p. 510-11. Although Ingram was placed in an interrogation room that automatically locked, Detective Shelton checked on Ingram over the course of the two hours. Id. at 519. Thus, we find that a reasonable person in Ingram's position would believe that he was not being restrained of his freedom or in police custody. Miranda warnings were therefore not required, and the trial court did not err when it admitted the pre-Miranda portion of Ingram's recorded statement.

In a related argument, Ingram contends, relying on Missouri v. Siebert, 542 U.S. 600 (2004), that his post-Miranda statement resulted from an impermissible, two-step

7

interrogation process designed to circumvent and undermine Miranda. More specifically, in Siebert, the Supreme Court disapproved of the "question-first" police tactic for custodial interrogation in which the police first question a suspect who is in custody until the suspect confesses without being read his Miranda rights. Id. at 604-05. Then, police would read the suspect his Miranda rights and question the suspect until he repeats the answers provided earlier. Id. at 606. The Supreme Court found that "the question-first tactic effectively threatens to thwart Miranda's purpose of reducing the risk that a coerced confession would be admitted." Id. at 617.

Notwithstanding the rule in Siebert, in United States v. Thompson, the Seventh Circuit interpreted Siebert to declare unconstitutional "the 'question-first' police protocol for custodial interrogation." 496 F.3d 807, 811 (7th Cir. 2007) (citing Siebert, 542 U.S. at 604-604 (observing that "[t]his case tests a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until the interrogation has produced a confession")). The court concluded that the initial questioning by FBI agents in Thompson was non-custodial and, therefore, the rule in "Siebert does not apply." Id. at 811. Having concluded that Ingram was not in custody when he made his pre-Miranda statements, we find that the trial court did not err when it admitted Ingram's post-Miranda statements.

## II. Sufficiency of the Evidence

Ingram challenges his conviction for voluntary manslaughter, arguing that the evidence was insufficient to prove that he acted knowingly. When we review a claim of

8

sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. Parahams v. State, 908 N.E.2d 689, 691 (Ind. Ct. App. 2009). We look only to the probative evidence supporting the judgment and the reasonable inferences therein to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. Id. If there is substantial evidence of probative value to support the conviction, it will not be set aside. Id. It is the function of the trier of fact to resolve conflicts of testimony and to determine the weight of the evidence and the credibility of the witnesses. Yowler v. State, 894 N.E.2d 1000, 1002 (Ind. Ct. App. 2008).

Voluntary Manslaughter is defined by Indiana Code section 35-42-1-3, which states in pertinent part:

> (a) A person who knowingly or intentionally . . . kills another human being . . . while acting under sudden heat commits voluntary manslaughter, a Class B felony. However, the offense is a Class A felony if it is committed by means of a deadly weapon.

Ingram challenges that the evidence failed to show that he knowingly or intentionally killed Lucas. A person acts knowingly if, when the person engages in the conduct, the person is aware of a high probability that the person is doing so. Ind. Code § 35-41-2-2(b). Ingram argues that his statement to police and trial testimony that he fired a warning shot diagonally into the air shows that he did not knowingly kill Lucas. Tr. p. 297-315, 329, 348-49.

9

Here, the evidence most favorable to the verdict shows that Ingram testified that, after observing a man stealing from Ingram's car, he retrieved his handgun, and went outside to confront the man. Id. at 301. Ingram does not dispute firing his handgun or that his bullet killed Lucas. Dr. Sozio, testified that Lucas died from a bullet wound to the back. Id. at 242. Further, Dr. Sozio observed that bullet wound was "very concentric and circular" and then explained that such a wound is indicative of a bullet that followed a direct path from the shooter to the victim. Id. at 242-43. Thus, contrary to Ingram's assertion that he fired only a warning shot into the air and did not intend to shoot Lucas, we find that this evidence is sufficient for a reasonable fact-finder to conclude that Ingram fired at Lucas and therefore knowingly killed Lucas.

The judgment of the trial court is affirmed.

DARDEN, J., and BAILEY, J., concur.