## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 21 2017, 8:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Chris M. Teagle
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Charles R. Whittington, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | February 21, 2017 <br><br> Court of Appeals Case No. <br> 05A02-1512-CR-2359 <br><br> Appeal from the Blackford Circuit Court <br><br> The Honorable Dean A. Young, Judge <br><br> Trial Court Cause No. <br> 05C01-1502-MR-41 |

**Altice, Judge.**

## Case Summary

[1] Following a jury trial, Charles R. Whittington was convicted of two counts of murder and sentenced to an aggregate term of 170 years in the Department of Correction. Whittington raises the following issues on appeal:

1. Did the trial court abuse its discretion in admitting Whittington's statements to police?

2. Was the jury's verdict of guilty—rather than guilty but mentally ill (GBMI)—contrary to law?

3. Is Whittington's 170-year sentence inappropriate?

[2] We affirm.

## Facts & Procedural History

[3] In January of 2015, Whittington was a regular visitor at Shane Williamson's Hartford City apartment. Whittington had recently split up with his girlfriend, Heather Lennartz, and Lennartz had blocked him on Facebook and her cell phone. Lennartz had also been childhood friends with Shane, and they had reconnected on Facebook around the end of 2014 or the beginning of 2015. When Whittington visited Shane's home, he would often use Shane's Facebook profile and cell phone to contact Lennartz while pretending to be Shane. At some point, Lennartz sent provocative photographs of herself to Shane. Whittington was angry about the photos and repeatedly demanded that Shane give them to him, even though Shane had already done so and then deleted the photos.

[4] In early February 2015, Whittington was served with a restraining order barring him from contacting Lennartz and her children. When Whittington spoke with Lennartz's mother on February 2, 2015, he told her that Shane had photos of Lennartz and that he was going to get the cell phone and delete the photos even if he had to "beat the fuck out of him[.]" *Transcript* at 321.

[5] On the morning of February 5, 2015, Whittington drove to Shane's apartment. Shortly after 9 a.m., he entered the bedroom of Katelin Williamson, Shane's fourteen-year-old daughter, and shot her in the face at close range, killing her. Whittington then shot Shane twice in the head after a struggle in Shane's truck, which took place in the parking lot of the apartment complex and in front of eyewitnesses. Shane also died as a result of his injuries.

[6] On February 9, 2015, the State charged Whittington with two counts of murder. The State also filed two sentencing enhancements based on Whittington's use of a firearm in the murders. A five-day jury trial commenced on November 3, 2015, at which Whittington asserted an insanity defense. On November 9, 2015, the jury returned guilty verdicts on the murder charges and found that Whittington had used a firearm in the commission of the offenses as required to support the sentencing enhancements. On December 1, 2015, the trial court sentenced Whittington to sixty-five years for each of the murder convictions, enhanced each count by twenty years based on the use of a firearm, and ordered the sentences to run consecutively, resulting in an aggregate term of 170 years imprisonment. Whittington now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

### Admission of Statements

[7] Whittington first argues that the trial court erred in admitting his statements to police because those statements were obtained in violation of his *Miranda* rights.

> The trial court has broad discretion in ruling on the admissibility of evidence, and we will reverse the trial court's ruling only when the trial court abuses that discretion. *Fuqua v. State*, 984 N.E.2d 709, 713-14 (Ind. Ct. App. 2013), *trans. denied*. The trial court abuses its discretion only if its decision regarding the admission of evidence is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id.* Regardless of whether the challenge is made through a pretrial motion to suppress or by an objection at trial, our review of rulings on the admissibility of evidence is essentially the same: we do not reweigh the evidence, and we consider conflicting evidence in a light most favorable to the trial court's ruling, but we may also consider any undisputed evidence that is favorable to the defendant. *Id.* Additionally, we may consider foundational evidence introduced at trial in conjunction with any evidence from a suppression hearing that is not in direct conflict with the trial evidence. *Kelley v. State*, 825 N.E.2d 420, 427 (Ind. Ct. App. 2005).

*Hicks v. State*, 5 N.E.3d 424, 427 (Ind. 2014), *trans. denied*.

[8] On appeal, Whittington claims that police employed the sort of "question-first" interrogation technique condemned by the United States Supreme Court in *Missouri v. Seibert*, 542 U.S. 600 (2004). Officers using this technique withhold *Miranda* warnings until after a suspect has confessed, and thereafter, give

*Miranda* warnings and secure a waiver before obtaining a second, similar confession. *Id.* at 611-14. As the *Seibert* court explained:

> Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail. Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." By the same token, it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.

*Id.* at 613-14 (alteration in original, footnote omitted). Thus, the Court held that the defendant's statements made both before and after *Miranda* warnings were inadmissible. *Id.* at 617.

[9] Indiana courts have consistently applied *Seibert* to hold a defendant's post-*Miranda* statements inadmissible in situations where a defendant has been interrogated prior to receiving *Miranda* warnings and confessed or made

incriminating statements, and then repeated those statements after receiving *Miranda* warnings. *See, e.g., Kelly v. State*, 997 N.E.2d 1045, 1053-54 (Ind. 2013); *Morris v. State*, 871 N.E.2d 1011, 1018-19 (Ind. Ct. App. 2007), *trans. denied*. But our review of the record in this case reveals that Whittington was not subjected to pre-*Miranda* interrogation.

[10] Whittington was arrested on the day of the murders and transported to the Jay County Jail. Whittington was handcuffed and placed in an interview room, and Officer Todd Wickey of the Portland Police Department sat with him while waiting for Hartford City police to arrive. It is undisputed that Whittington had not been Mirandized at that time. Contrary to Whittington's arguments, however, the evidence favorable to the trial court's ruling establishes Officer Wickey did not interrogate him. Indeed, Officer Wickey testified that he did not ask Whittington any questions and merely listened while Whittington talked about his motorcycle and his recipe for ribs, which Whittington said he had been making that day. *See White v. State*, 772 N.E.2d 408, 412 (Ind. 2002) (explaining that "[u]nder *Miranda*, 'interrogation' includes express questioning and words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect" and that "[v]olunteered statements do not amount to interrogation"). Although Whittington claims that Officer Wickey questioned him concerning his activities that day, it is not our province to judge the credibility of witnesses in this manner on appeal. Because Whittington was not interviewed until after Officer Matthew Felver of the Hartford City Police Department arrived and

advised him of his *Miranda* rights, Whittington's reliance on *Seibert* and its progeny is misplaced.

## Rejection of GBMI Verdict

Next, Whittington challenges the jury's failure to return a GBMI verdict.[1] Ind. Code § 35-36-2-3 provides that, in all cases where a defense of insanity is raised, the jury shall determine whether the defendant is guilty, not guilty, not responsible by reason of insanity, or "guilty but mentally ill at the time of the crime." For purposes of a GBMI verdict, "mentally ill" means "having a psychiatric disorder which substantially disturbs a person's thinking, feeling, or behavior and impairs the person's ability to function."[2] I.C. § 35-36-1-1. When a defendant challenges a jury's failure to return a GBMI verdict as contrary to law, we grant substantial deference to the verdict in light of the jury's "right to determine the law and the facts" in all criminal cases. *Satterfield v. State*, 33 N.E.3d 344, 348 (Ind. 2015) (quoting Ind. Const. art 1, § 19). Because a defendant raising such a challenge appeals from a negative judgment, he faces a heavy burden. *Id.* Indeed, the conviction will be set aside only if the evidence is without conflict and leads to only the conclusion that the defendant was GBMI. *Id.* In considering such issues, this court "will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of

---

[1] Whittington does not challenge the jury's rejection of his insanity defense.

[2] Although not relevant in this case, the term "mentally ill" also expressly includes "having an intellectual disability." I.C. § 35-36-1-1.

fact." *Id.* (quoting *Myers v. State*, 27 N.E.3d 1069, 1074 (Ind. 2015)). We will consider only the evidence favorable to the verdict and the reasonable and logical inferences flowing therefrom. *Id.*

[12] Whittington argues that the jury's decision to find him guilty rather than GBMI was "contrary to the evidence and erroneous[,]" but he fails to cite or apply the statutory definition of mentally ill. *Appellant's Brief* at 18. Accordingly, his argument in this regard is waived. *See Davis v. State*, 835 N.E.2d 1102, 1113 (Ind. Ct. App. 2005) (explaining that "[a] party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record"), *trans. denied*.

[13] Waiver notwithstanding, we cannot say that the evidence presented concerning Whittington's mental condition at the time of the crime was without conflict and led only to the conclusion that he was mentally ill as defined in I.C. § 35-36-1-1 at the time of the murders. Although there was evidence presented that Whittington had previously been diagnosed with a number of mental illnesses, including schizophrenia, bipolar disorder, depression, anxiety, and post-traumatic stress disorder, there was also significant evidence that Whittington had a history of malingering and being dishonest with service providers. For example, Whittington had previously told mental health care providers that he had hallucinated clowns and that an alter ago named "Elmer" could make him do things, but he later admitted that he was being untruthful. Yet when he was interviewed by investigators on the day of the murders, he again claimed to have an alter ego named Elmer, and he stated that "when Elmer comes out, he

doesn't remember what Elmer does." *Transcript* at 275. Whittington also lied to service providers about being in active combat in Vietnam. Dr. Craig Buckles testified that although Whittington had been diagnosed with schizophrenia early on, many of Whittington's service providers had serious doubts about this diagnosis. Dr. Buckles testified further that he did not observe any signs of a thought disorder in Whittington.

[14] Moreover, evidence of Whittington's behavior around the time of the murders supports a conclusion that Whittington was not mentally ill at the time of the crimes within the meaning of I.C. § 35-36-1-1, in that his thinking, feeling, and behavior was not substantially disturbed and his ability to function was not impaired. Brian McDonald, who was Shane's close friend and who had spent time with Whittington at Shane's apartment, testified that approximately one week before the murders, Whittington had said that "all he had to do was quit taking his medication and he had . . . a free pass to kill." *Transcript* at 149. Three days before the murders, Whittington told Lennartz's mother that he was going to delete the photos of Lennartz from Shane's phone even if he had to "beat the fuck out of him[.]" *Id.* at 321 The day before the murders, Whittington went to the VA office in Marion and requested his medical records. The VA records from that date showed that Whittington met with a therapist and discussed his relationship with Lennartz and the restraining order with a therapist and that Whittington was "lucid and oriented" and "did not express bizarre, paranoid or delusional thoughts." *Exhibit Volume IV* at 30. Immediately after the murders, Whittington altered his appearance by shaving

his beard and he disposed of the baseball cap he was wearing while he committed the crimes. After he was arrested, Whittington denied ever having been to Shane's apartment and lied to police about owning a 9mm handgun.

[15] Although it is undisputed that Whittington had been diagnosed with some psychiatric disorders in the past, the evidence in this case amply supported a conclusion that any psychiatric disorder Whittington might have had at the time he murdered Katelin and Shane did not substantially disturb his thinking, feeling, or behavior and impair his ability to function. Indeed, the evidence presented easily supports a conclusion that Whittington acted out of anger and jealousy, and then sought to use his mental health history to escape responsibility for his actions. Because Whittington has fallen far short of establishing that the evidence presented concerning his mental state at the time of the murders was without conflict and led only to the conclusion that he was GBMI, we affirm the jury's guilty verdict. *See Satterfield*, 33 N.E.3d at 350-51 (affirming a jury's rejection of a GBMI verdict where the evidence supported a conclusion that the defendant was acting deceitfully).

## Sentencing

[16] We first note that Whittington's sentencing argument conflates two separate sentencing standards: whether the trial court abused its discretion in identifying mitigating and aggravating factors and whether Whittington's sentence is inappropriate pursuant to Indiana Appellate Rule 7. "As our Supreme Court has made clear, inappropriate sentence and abuse of discretion claims are to be

analyzed separately." *King v. State*, 894 N.E.2d 265, 267 (Ind. Ct. App. 2008). Accordingly, "an inappropriate sentence analysis does not involve an argument that the trial court abused its discretion in sentencing the defendant." *Id.*

[17] With respect to Whittington's argument concerning the trial court's consideration of aggravating and mitigating factors, we note that sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. So long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion. *Id.* "An abuse of discretion occurs if the decision is 'clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom.'" *Id.* at 490 (quoting *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006)).

[18] A trial court may abuse its sentencing discretion in a number of ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law. *Id.* at 490-91. If the trial court abuses its discretion in one of these or another way, remand for resentencing is the appropriate remedy "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Id.* at 491.

[19] First, Whittington acknowledges that the trial court identified his history of mental illness as a mitigating factor, but he appears to argue that the trial court afforded it insufficient mitigating weight. We note, however, that trial courts are no longer obligated to weigh such factors against each other when imposing a sentence. *Id*. Thus, a trial court cannot be said to have abused its discretion in failing to properly weigh such factors. *Id.* Accordingly, Whittington's argument in this regard is without merit.

[20] Whittington also argues that the trial court relied on an improper aggravating factor, namely, that the imposition of a lesser sentence would depreciate the seriousness of the offense. According to Whittington, "[t]his aggravator is only appropriate if the trial court is considering imposing a sentence less than the advisory." *Appellant's Brief* at 22. This is an inaccurate statement of the law. Our Supreme Court has held that "it is not error to enhance a sentence based upon the aggravating circumstance that a sentence less than the enhanced term would depreciate the seriousness of the crime committed." *Mathews v. State*, 849 N.E.2d 578, 590 (Ind. 2006). Therefore, the trial court did not abuse its discretion in relying upon this aggravating factor in imposing the maximum sentence. Moreover, even if the trial court had abused its discretion in this regard, reversal would not be necessary, both because we can say with confidence that the trial court would have imposed the same sentence had it not relied on this aggravating factor and because we conclude below that the sentence imposed is not inappropriate. *See Mendoza v. State*, 869 N.E.2d 546, 556 (Ind. Ct. App. 2007) (noting that "even if the trial court is found to have abused

its discretion in the process it used to sentence the defendant, the error is harmless if the sentence imposed was not inappropriate"), *trans. denied*.

[21] Turning now to Whittington's challenge to the appropriateness of his sentence, we note that although a trial court may have acted within its lawful discretion in imposing a sentence, Article 7, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of a sentence imposed by the trial court. *Alvies v. State*, 905 N.E.2d 57, 64 (Ind. Ct. App. 2009) (citing *Anglemyer*, 868 N.E.2d at 491). This appellate authority is implemented through Indiana Appellate Rule 7(B), which provides that a court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Anglemyer*, 868 N.E.2d at 491. Nevertheless, "we must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Stewart v. State*, 866 N.E.2d 858, 866 (Ind. Ct. App. 2007). The appellant bears the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[22] The determination of whether we regard a sentence as inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Bethea v. State*, 983 N.E.2d 1134, 1145 (Ind. 2013) (quoting *Cardwell v.*

*State*, 895 N.E.2d 1219, 1224 (Ind. 2008)). Moreover, "[t]he principal role of such review is to attempt to leaven the outliers." *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013). It is not our goal in this endeavor to achieve the perceived "correct" sentence in each case. *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014). Accordingly, "the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original).

[23]  In order to assess the appropriateness of a sentence, we look to the statutory range established for the classification of the relevant offense. Whittington received the maximum 65-year sentence on each murder count, and the trial court imposed the maximum twenty-year firearm enhancement on each count. *See* Ind. Code § 35-50-2-3 (providing that a person who commits murder shall be imprisoned for a term ranging from forty-five to sixty-five years); I.C. § 35-50-2-11 (allowing an additional term of between five and twenty years when the defendant is found beyond a reasonable doubt to have used a firearm in the commission of certain offenses, including murder). The trial court ordered the sentences to be served consecutively, resulting in an aggregate term of 170 years. In other words, Whittington received the maximum sentence allowed by law. Our Supreme Court has explained that while "the maximum possible sentences are generally most appropriate for the worst offenders," this is not "a guideline to determine whether a worse offender could be imagined" as "it will always be possible to identify or hypothesize a significantly more despicable

scenario."[3] *Buchanan v. State*, 767 N.E.2d 967, 973 (Ind. 2002) (citations and quotation marks omitted). Thus, in reviewing a maximum sentence, "[w]e concentrate less on comparing the facts of this case to others . . . and more on focusing on the nature, extent, and depravity of the offense . . . and what it reveals about the defendant's character." *Wells v. State*, 904 N.E.2d 265, 274 (Ind. Ct. App. 2009), *trans. denied.*

[24]   Whittington's offenses were heinous in nature. Whittington ended two lives because he was angry and jealous over a woman who wanted nothing to do with him, and who had even obtained a restraining order preventing Whittington from contacting her or her children. Whittington shot Katelin, a fourteen-year-old girl who was completely uninvolved in Whittington's quarrel with Shane, in the face at close range. Katelin died an excruciating and terrifying death as a result of choking on her own blood. Although the precise sequence of events is not entirely clear from the record, it appears that Whittington then forced Shane to get into his truck. Once there, Whittington shot and killed Shane, and he did so in a parking lot of an apartment complex during the day. There were eyewitnesses to the murder, including a girl in the seventh grade. After the shooting, this young witness observed Whittington

---

[3] Whittington provides the reporter citation for *Hamilton v. State*, 955 N.E.2d 723 (Ind. 2011), but refers to the case as *McCormick v. State*. Whittington cites this case for the proposition that "maximum sentences should be *reversed* for the 'worst of the worst[,]'" and goes on to suggest that the trial judge should not have imposed the maximum sentence because it clearly believed that Whittington was among the worst of the worst. *Appellant's Brief* at 23 (emphasis supplied). Whittington has apparently misread *Hamilton*, in which our Supreme Court held that trial courts "should *reserve* maximum sentences for classes of offenses that constitute the worst of the worst." 955 N.E.2d at 727 (emphasis supplied).

open the driver's side door and saw Shane's body fall to the ground. Whittington then looked up at her and said "he fell" before bending down to grab something. *Transcript* at 23. Fearing that Whittington was reaching for a gun, the girl fled in terror. After the murders, Whittington took steps to alter his appearance and conceal his identity as the perpetrator. Whittington's sentence is certainly not inappropriate in light of the nature of the offenses.

[25] Whittington's argument concerning the appropriateness of his sentence in light of his character focuses almost exclusively on his history of mental illness. There are several factors that bear on the weight, if any, to be given mental illness in sentencing. *Taylor v. State*, 943 N.E.2d 414, 420 (Ind. Ct. App. 2011), *trans. denied.* "These factors include: (1) the extent of the defendant's inability to control his or her behavior due to the disorder or impairment; (2) overall limitations on functioning; (3) the duration of the mental illness; and (4) the extent of any nexus between the disorder or impairment and the commission of the crime." *Id.*

[26] The trial court in this case acknowledged the duration of Whittington's mental illness, but expressed doubt as to its severity and impact on Whittington's functioning and ability to control his behavior. *See Appellant's Appendix Vol. II* at 168 (sentencing order in which the trial court found as a mitigating circumstance that Whittington "had long-term mental health issues, although not nearly approaching the defendant's claim to insanity, episodic blackouts, and the existence of the defendant's fictional character 'Elmer'"). We reach a similar conclusion for the purposes of our App. R. 7(B) review. Although

Whittington had long-standing psychiatric diagnoses, there was significant evidence presented that Whittington had a history of malingering and exaggerating symptoms. A number of mental health care providers expressed doubts concerning Whittington's schizophrenia diagnosis, and Dr. Buckles testified that he saw no signs of a thought disorder in Whittington. Additionally, evidence presented concerning Whittington's behavior before and after the offenses supports an inference that Whittington was thinking rationally and in control of his behavior. Furthermore, Whittington has not established a nexus between his mental illness and his crimes. Instead, the evidence supports and inference that Whittington was acting out of anger and jealousy, and that he expected to use his history of mental illness to escape responsibility for his premeditated crimes. Indeed, about a week before the murders, Whittington told McDonald that if he stopped taking his medication, he would have "a free pass to kill." *Transcript* at 149. The evidence presented at trial paints a picture of a deceitful, manipulative, and violent criminal rather than a seriously mentally ill individual.

[27] We note, as did the trial court, that Whittington's criminal history was limited and remote in time. The seriousness of the crimes in this case, however, counterbalances the weight we attribute to this factor. We believe that the brutality and senselessness of the current offenses reveals Whittington's true character. In sum, Whittington truly is among the worst of the worst. As such, he is deserving of the maximum sentence.

Judgment affirmed.

Riley, J., and Crone, J., concur.